UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PATRICK M. HACKETT,

                Petitioner,

    v.

GERARD JONES, Superintendent of
Cayuga Correctional Facility,

                Respondent.

**DECISION AND ORDER**

1:19-CV-00901 EAW

## I.    **INTRODUCTION**

Patrick M. Hackett ("Petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 1).  Petitioner challenges the constitutionality of the judgment entered against him on November 13, 2014, in Genesee County Court of New York State (Moran, J.), following a jury verdict convicting him of third-degree rape (New York Penal Law ("P.L.") § 130.25(2)).  (*Id.* at 1).[1]  For the reasons below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## II.    **BACKGROUND**

### A.    **The Indictment**

On October 18, 2013, a Genesee County grand jury returned indictment number 5653 charging Petitioner with one count of third-degree rape, a class E felony, in violation

---

[1]    Page citations to pleadings filed by Petitioner are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.  Page citations to pleadings filed by Respondent are to the original pagination.

of P.L. § 130.25(2) (sexual intercourse between a defendant who is 21 years old or more and a victim who is less than 17 years old).  The charge was based on allegations that on April 15, 2013, Petitioner, who was 44 years old at the time, had sexual intercourse with H.O., who was then 15 years old.  (SR: 45-46).[2]

### B.     Pre-Trial Proceedings

Respondent indicates that Petitioner was arraigned on October 24, 2013,[3] at which time defense counsel requested an extension of time to file motions.  (Dkt. 16 at 2).  The trial court's clerk indicated that defense motions would be due on December 9, 2013; the prosecution's response would be due on December 16, 2013; and oral argument would be held on January 3, 2014.  (*Id.*).

Defense counsel filed an omnibus motion on November 22, 2013, seeking, among other things, discovery pursuant to New York Criminal Procedure Law ("C.P.L.") Article 240[4] and disclosure of information within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963).  (SR: 50-68).  In response, the prosecution argued that Petitioner failed to make a timely demand to produce pursuant to C.P.L. § 240.80(1)[5] and therefore was not entitled

---

[2]     Citations to "SR:" refer to the Bates-stamped page numbers of the state court records filed under seal by Respondent.

[3]     Respondent has not filed any transcripts of proceedings that occurred in Petitioner's case prior to June 24, 2014.

[4]     C.P.L. §§ 240.10 to 240.90 were repealed by L.2019, c. 59, p. LLL, § 1, effective Jan. 1, 2020.

[5]     C.P.L. § 240.80 formerly provided, in relevant part, that:

to court-ordered discovery pursuant to C.P.L. § 240.40(1)(a).[6] (SR: 69). Nevertheless, the prosecution provided the defense with the following items of discovery: Petitioner's Division of Criminal Justice Services printout; the search warrant, search warrant application and search warrant return; two Genesee County Sheriff's Office evidence/property records; and photos of text messages. (SR: 70). The prosecution indicated that it was not aware of, or in possession of, any *Brady* material. (*Id.*).

In papers dated January 16, 2014, defense counsel moved for supplemental discovery, a *Sandoval* hearing, and to suppress physical evidence. (SR: 77-82). Defense counsel conceded that his motion for discovery was untimely under former C.P.L. § 240.80(1) but noted that the prosecution voluntarily had provided him with "various

---

> [a] demand to produce shall be made within thirty days after arraignment and before the commencement of trial. If the defendant is not represented by counsel, and has requested an adjournment to obtain counsel or to have counsel assigned, the thirty-day period shall commence, for purposes of a demand by the defendant, on the date counsel initially appears on his behalf. However, the court may direct compliance with a demand to produce that, for good cause shown, could not have been made within the time specified.

N.Y. Crim. Proc. Law § 240.80(1), *repealed by* L.2019, c. 59, pt. LLL, § 1, eff. Jan. 1, 2020.

[6]     C.P.L. § 240.40(1)(a) formerly provided, in relevant part, that:

> [u]pon motion of a defendant against whom an indictment . . . . is pending, the court in which such accusatory instrument is pending: (a) must order discovery as to any material not disclosed upon a demand pursuant to section 240.20, if it finds that the prosecutor's refusal to disclose such material is not justified. . . .

N.Y. Crim. Proc. Law § 240.40(1)(a), *repealed by* L.2019, c. 59, pt. LLL, § 1, eff. Jan. 1, 2020.

materials related to the requests for discovery and inspection." (SR: 79).  Defense counsel

requested that the prosecution be compelled "to provide, as requested in the original

[o]mnibus [m]otion, complete copies of all search warrants, together with all supporting

affidavits and any other documents in support of any warrants which resulted in the seizure

of property in this case." (SR: 80).

In particular, defense counsel requested (1) "a complete list and/or photographs of

all messages reviewed as a result of the search warrant;" and (2) "what purports to be a

report from the Batavia Police Department 13-4659, which is referenced in the application

of said warrant" but was not "provided with the voluntary discovery material." (SR: 81).

Defense counsel was referring to search warrant applications for Petitioner's journal and

text messages from his cell phone, respectively. (SR: 85, 91).  In the warrant applications,

Genesee County Sheriff's Deputy Christopher Erion ("Deputy Erion") stated:

> On April 15[], 2013 City of Batavia Police Department, Officer A.C. Perkins
> took a report of a missing 15[-]year[-]old female, who left her mother's care
> and supervision without permission on 04-14-2013, and went to an unknown
> location.  See attached report from Batavia Police Department 13-4659.

(SR: 85; *see also* SR: 91 (same)).

The trial court issued a decision and order dated February 20, 2014, resolving the

various outstanding requests by the defense.  (SR: 128-30).  In relevant part, the trial court

stated:

> The People represent that they have responded to defendant's demand for
> discovery to the limited extent required by [former] CPL § 240.20; and deny
> possession of any further information or materials for which disclosure is
> required on demand.  It cannot be concluded from the defendant's papers that
> the People have made an untimely or unjustifiable refusal to disclose any

demanded materials, or that good cause exists for additional discretionary discovery ([former] CPL § 240.40(1)).
. . .
The People submit that they are unaware of any items which would constitute *Brady* material (*Brady v. Maryland*, 373 US 83), and defendant's papers reveal no basis to believe that there exists any exculpatory information, of the types specifically demanded, for which disclosure is required. The People are reminded of their continuing duty to disclose any such material as it comes into their possession. Beyond that, defendant's motion is granted only to the extent that the People otherwise would be required to make a unilateral disclosure, based upon the substantial exculpatory character of the information.

(SR: 129-30 (citation omitted)).

On April 1, 2014, defense counsel filed a motion to controvert the search warrants (SR: 131-37), which the prosecutor opposed (SR: 147). In a decision and order dated May 13, 2014, the trial court granted suppression of Petitioner's journal. (SR: 149). The trial court denied the motion to suppress what it referred to as the "photo warrant," finding that H.O.'s supporting deposition (SR: 145-46) "provided reasonable cause to believe that photographs of the scene would verify and confirm her description of premises to which she would not ordinarily be privy, and thereby 'tend[] to demonstrate that an offense was committed' at that location." (SR: 150 (brackets in original)).

On June 30, 2014, defense counsel moved to suppress the text messages, arguing that prior to the issuance of the search warrant, the police conducted an illegal search and seizure of Petitioner's cell phone and used the fruits of that search in their application for the warrant. (SR: 153-55). Defense counsel relied on a recent Supreme Court decision, *Riley v. California*, 573 U.S. 373 (2014), decided five days earlier. (SR: 153). The trial court denied the motion. (SR: 165-66). The trial court found that since Petitioner had not

previously moved to suppress the evidence obtained from his cell phone, the motion was not a proper motion to reargue or renew but rather was "a (second) supplemental motion for suppression, contrary to the single motion rule of CPL § 255.20(2)." (*Id.*). The trial court further determined to the extent Deputy Erion obtained a warrant before searching Petitioner's cell phone, "it cannot be concluded that the United States Supreme Court's Decision in *Riley v. California*, requiring same, provides good cause for the supplemental motion." (SR: 166). Alternatively, the trial court held that even assuming Deputy Erion's "preliminary calls to [Petitioner]'s seized cell phone, which were essentially confirmatory in nature, constituted unwarranted searches which must be disregarded in determining probable cause, the balance of the information provided in the search warrant application established probable cause. . . ." (*Id.*). Therefore, the trial court held that suppression of the text messages was not required.

### C.    Trial

#### 1.    Prosecution's Case

H.O. testified that she was in foster care in April 2013, and was 15 years old at the time. (TT: 212-13).[7] She met Petitioner through her biological mother, H.F., at a laundromat in Batavia. (TT: 213-14). She described Petitioner as just an acquaintance and said Petitioner and her mother were "friendly." (TT: 214-15).

On the weekend of April 13-14, 2013, H.O. was having scheduled visitation at H.F.'s house; she was supposed to go back to foster care on Sunday, April 14, 2013. (TT:

---

[7]    Citations to "TT:" refer to pages of the trial transcript. (Dkt. 30). The Court has referenced the transcript pagination.

215).  However, H.O. did not want to go back to her foster mother's house.  (TT: 215-16).

Using H.F.'s cell phone, H.O. texted numerous people in an effort to find a place to stay.

(TT: 216-17).  She was unsuccessful until she tried texting Petitioner, who said she could

stay with him.  (TT: 217-18).  Petitioner lived in a second-floor apartment on Main Street

in East Pembroke; H.O. had never been there before.  (TT: 218-19).

H.O. got a ride from a friend to Petitioner's apartment.  Once she arrived, they talked

for a while and watched a movie.  (TT: 219).  Petitioner gave her some cans of beer to

drink.  (TT: 220).  After the movie, Petitioner asked H.O. if she wanted a hug before going

to bed; H.O. declined.  (TT: 220-21).  Petitioner went to his bedroom, and H.O. went to

bed on the pullout couch.  (TT: 220).  H.O. slept in the clothes she had been wearing that

day (sweater, jeans, bra, and underwear).  (TT: 221).

Just as H.O. was dozing off, Petitioner came out of his room, sat down next to her,

and said, "This isn't right."  (*Id.*).  When H.O. asked what he meant, Petitioner replied that

"if [she] was at his house that [she] had to have sex with him."  (TT: 221-22).  At first,

H.O. thought he "was joking" but he then said, more than once, "I'm waiting.  I'm serious."

(TT: 222).  Petitioner also said that if she did not have sex with him, he would "kick [her]

out."  (TT: 222-23).

H.O. "eventually gave in" to Petitioner's demand.  (TT: 223).  She took off her jeans

but kept her panties on, and Petitioner then put his penis in her vagina.  (TT: 223, 283-84).

Afterwards, Petitioner returned to his bedroom; H.O. took a shower and went to sleep on

the couch.  (TT: 224).

The following morning, H.O. said that Petitioner did not go to work.  (TT: 224).

She stayed at Petitioner's apartment for four or five more days; he did not try to have sexual

intercourse with her again.  (*Id.*).

H.O. testified that on the morning of Saturday, April 20, Petitioner woke her up and

told her that someone was at the apartment[8] and that she had to hide in the attic, so she did.

(TT: 224-25).  H.O. heard a female voice but could not hear what the woman and Petitioner

were saying.  (TT: 225).  H.O. left Petitioner's apartment later that day and went to a

friend's house in Holley.  (TT: 225).  H.F. came to get her, and H.O. eventually returned

to her foster mother's house in Byron-Bergen.  (*Id.*).

In early May 2013, H.O. disclosed what had happened at Petitioner's apartment to

her counselor.  (TT: 225-26).  The counselor called H.O.'s caseworker at the Genesee

County Department of Social Services ("DSS"), who in turn notified Deputy Erion.  (TT:

226, 306-07).

On May 3, 2013, H.O. met with Deputy Erion and gave a deposition.  (TT: 226-28,

295-96).  At a subsequent meeting on May 5, 2013, Deputy Erion requested that H.O.

contact Petitioner using the cell phone that H.F. had given her.  (TT: 228).  Deputy Erion

wanted to see if Petitioner would make any admissions relevant to the alleged sexual

---

[8]     On Saturday, April 20, 2013, Michele Pietroboni, who knew Petitioner professionally, visited his apartment without calling first.  (TT: 302).  She had been to Petitioner's home several times and described it as neat and orderly; however, that day, the apartment was uncharacteristically messy.  (TT: 303).

assault.  (TT: 308-09).  Deputy Erion provided guidance to H.O. regarding the nature of the text messages to send and the direction to take the conversation.  (TT: 309).

H.O. began texting Petitioner at about 3:00 p.m. on May 5, 2013.  She initially asked Petitioner, "So do you gave me an std. . . . Do you have one because I think you gave me one."  (TT: 325-27).  Petitioner responded, "Where are you and hell no."  (TT: 328).  H.O. replied that she was "on the run again" and said that he was "the only person [she] had sex with in like five months."  (*Id.*).  Petitioner asked H.O. about her symptoms and wanted to know why H.F. had said "she will call the cops on [him]."  (TT: 329, 331).

H.O. told Petitioner, "I did not tell me mom we had sex and I don't want to have sex or do anything again so I can figure this out."  (TT: 334).  Petitioner sent a text saying:

> I believe you didn't say anything [to H.F.] because I know you ain't no rat. I have to tell you something though.  It's fucked up that I feel this way, but I am torn between knowing it's twisted and kind of sick and not caring.  I love both you and your mom[, H.F.].  You are the same. . . . I want, somehow, to be with and take care of both of you.  I know it sounds so crazy and twisted and I will leave you alone forever if you want me to, like your mom now does, but, I hope that won't be the case. . . . I love you [H.O.] and I love your mom too.

(TT: 339-40).  Petitioner later texted:

> If I have something it must have been from Allie.  She is doing it with a bunch of different guys then and probably still is.  Told me she sees a couple. Knowing her that means five or six.  I don't have any symptoms though. Nothing.

(TT: 341).

At about 4:30 or 5:00 p.m. on May 5, 2013, the meeting between Deputy Erion and H.O. ended; however, Deputy Erion kept the cell phone and continued texting with

Petitioner, pretending to be H.O.   (TT: 342-43).   The text conversation continued throughout the evening of May 5.   (TT: 343-45).

On the morning of May 6, 2013, Petitioner sent a text saying that he wanted to make sure it was not H.O.'s mother texting him and "trying to trap him off."   (TT: 350-51). Petitioner asked, "In my place, where is the tv?"   (TT: 351).   Having never been to Petitioner's house, Deputy Erion did not know where the television was located, so he called H.O.'s school to talk to her.   (TT: 351-52).   H.O. informed Deputy Erion that the television was sitting on a "treasure chest thing" near the window.   (TT: 232, 352).   Deputy Erion relayed that information to Petitioner.   (TT: 352-53).   Deputy Erion also sent a text stating, "Relax.   And prob no std.   Either pregnant [or] something else.   They said should know this afternoon."   (TT: 353).   Petitioner responded, "I love you [H.O.]"   (TT: 353).

Later that day, Petitioner sent a text message stating:

[H.O.], your the most beautiful female anything I have ever seen in my life. I can't even put it into words. . . . I feel love for you that makes me shake like I am freezing or something.   I want to satisfy you like no other has.   If you say you won't have sex with me again I don't think I could handle it, especially since the first time was so awkward for me because you kept your panties and bra and top on.   I basically could not do anywhere near what I know, you would like.   [H.F.] won't ever do anything with me now and losing her sucks, but, if I can't have and love you either, I can't deal with that.

(TT: 353-54).

Deputy Erion continued to text with Petitioner throughout the day on May 6.   (TT: 355-58).   Petitioner sent multiple texts proclaiming his love for H.O. and describing his sexual attraction to her.   (TT: 357-58).   Deputy Erion sent a text in the late afternoon on May 6 saying, "I come out there [to Petitioner's apartment] tomorrow.   Prob get there late

after dark."  (TT: 357).   Petitioner replied, urging H.O. to come over that night and promising to make her dinner.  (TT: 359).  The text conversation continued throughout the day on May 7.  (TT: 364-67).

At about 4:30 p.m. on May 7, Deputy Erion saw Petitioner exit Borrell's Gym in Batavia.  (TT: 367-68).  Petitioner appeared to be sending a text message on a small cell phone.  (TT: 368).  Moments later, Deputy Erion received a text message on H.O.'s phone that said, "I'm on my way home now."  (*Id.*).  At Deputy Erion's direction, other officers arrested Petitioner and seized his cell phone.  (TT: 369).  Deputy Erion sent one more text message from H.O.'s phone to Petitioner's phone to ensure that the cell phone seized from Petitioner was the one he had been using to text H.O.  (TT: 369-70).  The display on Petitioner's cell phone indicated that there was a new text message from H.O.  (TT: 370).  This notification was visible from an exterior screen; Deputy Erion did not open the phone.  (TT: 370).

### 2.    Defense Case

Petitioner stipulated to his date of birth.  (TT: 427).  He testified that he met H.O. at the Golden Coin Laundromat on April 7, 2013; he had gone there that day to meet her mother, H.F.  (TT: 433-34, 440).  He had known H.F. for about a year; they had "just a friendly relationship."  (TT: 435).  After meeting at the laundromat, Petitioner went over to H.F.'s apartment and stayed until about 5:30 p.m.  (TT: 438).  Petitioner testified that the conversation between H.O. and H.F. was "[h]ighly sexual" and that the two of them were "play fighting" like "little kids" on the couch for hours.  (TT: 438-39).

The following Sunday, April 14, at around 9:30 or 10:00 a.m., Petitioner went over to H.F.'s apartment at H.O.'s invitation. (TT: 439-40). H.F. was not at home. (TT: 441). While they were watching a movie, Petitioner said that H.O. took off her pants, straddled him, "locked her legs around [his] waist, [and] started grinding pretty hard, her pelvis right into [his] crotch." (TT: 442). After about 20 or 30 seconds, Petitioner managed to get H.O. off of him, but "it was difficult" because "she kept [him] off balance by moving" and he "didn't have much of a space to . . . stand up." (TT: 442-43).

H.F. returned home at around noon. (TT: 443). They all sat on the couch and watched a movie. Petitioner was in the middle; H.O. and H.F. were on either, with a blanket over all three of them. (*Id.*). H.O. and H.F. again were "play fighting" as they had on April 7, kicking each other's feet across his lap. (TT: 443-44). Petitioner "got sick and tired of what they were doing" because they were "hitting [him] right in [his] groin," so he "grabbed both of them and in like a head lock" and "playfully" told them to stop. (TT: 444-45). H.F. "shoved her hand" down his pants and "grabbed [his] testicles" and said, "'I'll rip them off if you don't let go,'" but she appeared to be joking. (TT: 445).

They finished watching the movie and ate some pizza. While at the apartment, Petitioner heard loud and repeated car-honking coming from a minivan parked outside. (TT 445-46). H.O. told him that one of the two women in the minivan was her foster mother. (TT: 447). Petitioner left H.F.'s apartment at 7:17 p.m.; he remembered the exact time because he looked at his digital watch. (TT: 445).

Petitioner got home at around 7:45 or 7:50 p.m. (TT: 448). Around 9:30 p.m., Petitioner received a phone call from H.F. (TT: 448-49). After speaking with her,

Petitioner attempted to arrange a ride for H.O. to his apartment, but he was unsuccessful. (TT: 449).  Around 10:30 p.m., H.O. let Petitioner know that her cousin, Danny, would give her a ride.  (TT: 450).  Petitioner met H.O. at a convenience store near his apartment. They walked back to his place, arriving at about 11:00 p.m.  (TT: 451-52).  He showed H.O. where the couch was located and offered her something to eat.  (TT: 452-53).  He gave her a blanket and a couple of pillows and then went to his bedroom at about 11:30 p.m., leaving the door ajar.  (TT: 453-54).

Around midnight, H.O. appeared at his bedroom doorway, told him he was snoring loudly, and closed the door.  (TT: 454-55).  Petitioner got up once at about 2:00 a.m., to use the bathroom.  (TT: 455).  He did not have to pass by the living room where H.O. was staying to get to the bathroom, and he did not see H.O.  (*Id.*).  He then got up at his regular time, between 5:00 and 5:30 a.m.  (*Id.*).  He called in sick to work because he had a sinus headache and chills.  (TT: 456).  He went back to bed, eventually getting up around 9:00 a.m.  (*Id.*).  H.O. was still sleeping on the couch; she did not get up until 11:00 a.m. or 12:00 p.m.  (TT: 456-57).  Petitioner stayed in the apartment with H.O. all that day.  (TT: 457).

Later in the week, Petitioner received a communication from H.F. saying that she had a package to give to H.O.  (TT: 462).  Petitioner arranged to meet H.F. on Friday, April 19, 2013, on his way to work.  (TT: 461-62).  H.F. gave Petitioner some items to give to H.O., including a cell phone and a prepaid card with minutes on it.  (TT: 462).  Petitioner gave the new phone to H.O.  (TT: 462-63).  H.O. left Petitioner's apartment on Saturday, April 20, 2013.  (TT: 463).

Petitioner denied having any physical contact with H.O. while she was at his apartment and denied ever having sexual intercourse with her.  (TT: 457, 459, 475). Petitioner denied telling H.O. that if she did not have sex with him, he would kick her out of his apartment.  (TT: 461).

Petitioner acknowledged that he sent the text messages about which Deputy Erion testified but stated that he believed he had been texting with H.F., not H.O.  (TT: 464-68, 481-82).  Petitioner testified that H.F. had the phone H.O. had been using while she was on the run; in fact, H.F. showed the phone to him.  (TT: 469).  He explained that H.F. did not update the name attached to the phone from H.O.'s name to her own name, and that is why the messages indicated they were from H.O.  (TT: 469-70).  Petitioner testified that when he texted, "[H.O.], I love you," he was trying to "antagonize" H.F.  (TT: 487).  He also acknowledged that when he asked where the television was located, it was a test; H.F. had never been to his apartment.  (TT: 488).  Petitioner testified that he actually was on his way to his girlfriend's house when he got arrested.  (TT: 491).

### 3.    Verdict and Sentence

The jury convicted Petitioner of third-degree rape as charged in the indictment.  (TT: 552).  On November 13, 2014, the trial court sentenced Petitioner to a determinate term of four years' imprisonment, to be followed by fifteen years of post-release supervision.  (ST: 14).[9]

---

[9]    Citations to "ST:" refer to the pages of the transcript of the sentencing hearing.  (Dkt. 30).

### D.     Post-Judgment Proceedings

Represented by new counsel, Petitioner pursued a direct appeal.  (SR: 1-34).  The prosecution filed a brief in opposition.  (SR: 386-413).  Petitioner also filed a *pro se* supplemental appellate brief (SR: 421-84), and the prosecution filed an opposition brief (SR: 485-505).  Appellate counsel and Petitioner each filed replies.  (SR: 414-84).  On November 9, 2018, the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division") unanimously affirmed the conviction.  *People v. Hackett*, 166 A.D.3d 1483 (4th Dep't 2018).  Appellate counsel and Petitioner separately sought leave to appeal (SR: 534-82), which the New York Court of Appeals denied on February 6, 2019 (SR: 595-96).

### E.     Federal Habeas Proceeding

In his timely petition (Dkt. 1), Petitioner asserts that he is entitled to habeas relief because: (1) defense counsel erroneously admitted that the discovery motion was untimely (*id.* at 14 ("Ground One")); (2) the trial court violated due process by preventing Petitioner from developing the facts needed for a suppression hearing and denying the hearing when "good cause" was apparent on the face of the search warrant application (*id.* at 15 ("Ground Two")); (3) the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding the second page of Batavia Police Department Incident Report No. 2013-00004659 in which H.F. reported that H.O. was missing (*id.* ("Ground Three")); (4) the conviction was based on evidence seized in violation of the Fourth Amendment (*id.* ("Ground Four")); (5) the trial court erroneously concluded that defense counsel's motion for discovery was untimely (*id.* at 16 ("Ground Five")); (6) the trial court erroneously

refused defense counsel's request for a suppression hearing (*id.* at 17 ("Ground Six")); and (7) the Appellate Division's decision misstated the trial record (*id.* at 18 ("Ground Seven")).

Respondent filed a motion to file his responsive pleadings and the state court records and transcripts under seal. (Dkt. 14). The Court granted the motion in part and denied it in part. (Dkt. 15). Respondent was granted permission to file the state court records and transcripts under seal but was ordered to file a redacted memorandum of law on the public docket and to provide an unredacted version of the memorandum of law to the Court. (*Id.*).

In the memorandum of law (Dkt. 16) in opposition to the petition, Respondent argued that the ineffectiveness claim was meritless, the claims related to the suppression of evidence were barred from habeas review, and the trial court's denial of the discovery motion did not prejudice the defense. As far as the *Brady* claim, Respondent asserted that the Appellate Division adjudicated the claim on the merits, making it subject to the limitations on relief imposed by 28 U.S.C. § 2254(d). (*Id.* at 23). Respondent noted that the prosecution never disclosed the second page of the report, apparently because it was not within the statutory discovery requirements nor *Brady* material. (*Id.* at 24). Therefore, Respondent concluded, it was not part of the record before the Appellate Division and could not be considered by this Court. (*Id.* (citing *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (stating that because the language of § 2254(d)(1) is "backward-looking," it "requires an examination of the state-court decision at the time it was made" and thus "the record under review is limited to the record in existence at that same time–i.e., the record before the state court")). Respondent indicated that he had obtained a copy of the police

report, including the undisclosed second page, and would provide it to the Court upon request.  (*Id.* at 25 n.5).

Petitioner sought and received an extension of time to file his reply.  (Dkt. 20).  He also filed a response (Dkt. 23) to a subsequent notice of appearance by Respondent's counsel.

On December 18, 2023, the Court issued a text order directing Respondent to provide a copy of the second page of Batavia Police Department Incident Report No. 2013-00004659, the subject of Petitioner's *Brady* claim.  (Dkt. 25).  Respondent also was directed to serve a copy upon Petitioner.  (*Id.*).  The Court acknowledged Respondent's argument that the report's second page was not part of the state court record and could not be considered in this habeas proceeding.  (*Id.* (citing (Dkt. 16 at 24)).  The Court indicated that by ordering Respondent to file a copy of the report's second page, it expressed no opinion as to whether or not the second page of the report was part of the record below and, if not, whether the record in this proceeding could or should be expanded to include it.  (*Id.*).

Respondent subsequently filed a letter-motion dated December 21, 2023 (Dkt. 26), seeking leave to file his response to Docket 25 under seal because it identified the minor victim of a sex crime.  By text order (Dkt. 27), the Court granted Respondent permission to file, under seal, an unredacted copy of the police report referenced in Docket 25.  The Court further directed Respondent to submit the unredacted report directly to Chambers for filing and to publicly file a redacted copy of the report.  (Dkt. 27).

Respondent filed a redacted version on the Court's public docket on December 28, 2023.  (Dkt. 28).  The unredacted version was filed under seal on January 2, 2024.  (Dkt. 29).

### III.  JURISDICTION

####    A.    The Habeas Statute's "In Custody" Requirement

"The federal habeas statute authorizes United States district courts to entertain petitions for habeas relief from state-court judgments only when the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Garlotte v. Fordice*, 515 U.S. 39, 43-44 (1995) (quoting 28 U.S.C. § 2254(a); citing 28 U.S.C. § 2241(c)(3)).  This statutory language "requir[es] that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed."  *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989) (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)).  However, "[i]t is well settled that jurisdiction is not defeated even if petitioner is later paroled, deported or otherwise released."  *Butti v. Fischer*, 385 F. Supp. 2d 183, 185 (W.D.N.Y. 2005) (citations omitted); *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("The District Court's conclusion that Spencer's release from prison caused his petition to be moot because it no longer satisfied the 'in custody' requirement of the habeas statute was in error.  Spencer was incarcerated by reason of the parole revocation at the time the petition was filed, which is all the 'in custody' provision of 28 U.S.C. § 2254 requires.").

When Petitioner filed his federal habeas petition on June 14, 2019, he was in Respondent's custody at Cayuga Correctional Facility, serving the sentence on the third-

degree rape conviction he attacks in the petition.  (Dkt. 1 at 20).  Accordingly, Petitioner has fulfilled the habeas statute's "in custody" requirement.

### B.      Mootness and Justiciability

Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to cases that present a "case or controversy."  *Spencer*, 523 U.S. at 7. "Thus, where the issues presented by a party in an action are no longer 'live,' or the party lacks a legally cognizable interest in the outcome, the federal action is properly dismissed as moot."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  "[T]o satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury, which is likely to be redressed by a favorable judicial decision."  *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999) (citation omitted).  "Unlike the 'in custody' requirement, mootness is not fixed at the time of filing but must be considered at every stage of the habeas proceeding."  *Nowakowski v. New York*, 835 F.3d 210, 217-18 (2d Cir. 2016) (citing *Carafas*, 391 U.S. at 237).

"A criminal case does not necessarily become moot when the convict finishes serving the sentence.  Instead, the case will remain a live case or controversy if there exists 'some concrete and continuing injury' or 'collateral consequence' resulting from the conviction."  *Mercurris*, 192 F.3d at 293 (quoting *Spencer*, 523 U.S. at 7).  Where the defendant challenges the criminal conviction itself, the Supreme Court "has been willing to *presume* the existence of collateral consequences sufficient to satisfy the case-or-controversy requirement; or in a practice that it views as 'effectively the same,' the Court has been willing 'to count collateral consequences that are remote and unlikely to occur.'"

*United States v. Probber*, 170 F.3d 345, 348 (2d Cir. 1999) (quoting *Spencer*, 523 U.S. at 8; emphasis in *Probber*).

The Supreme Court first articulated this presumption of collateral consequences in *Sibron v. New York*, 392 U.S. 40 (1968), noting that it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." *Id.* at 55. "After *Sibron*, a habeas petition challenging a criminal conviction is rendered moot by a release from imprisonment 'only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.'" *Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir. 2002) (quoting *Sibron*, 392 U.S. at 57).

On November 4, 2019, Petitioner completed his sentence for the third-degree rape conviction, a class E felony, and was released to parole supervision.[10]  Although Petitioner is no longer serving the sentence originally imposed for his felony conviction, the *Sibron* presumption of collateral consequences is appropriate because the petition challenges the constitutionality of that conviction.  *See Anderson v. Smith*, 751 F.2d 96, 100 (2d Cir. 1984) ("Clearly, Anderson's [habeas] challenges [to his attempted robbery conviction] are not moot, since a felony conviction carries certain 'collateral consequences.'. . .  For example, a convicted felon cannot obtain a license from some businesses, . . . or serve jury duty[.]") (quotation and internal citations omitted).  Accordingly, the petition continues to present a justiciable controversy amenable to review by this Court.

---

[10]     *See* https://nysdoccslookup.doccs.ny.gov/ (results for DIN 14B3477) (last accessed Jan. 9, 2024).

IV.   **STANDARD OF REVIEW**

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  Under § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence."  *Id.* § 2254(e)(1).

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)."  *Harrington*, 562 U.S. at 98.  "[W]hen it is unclear whether AEDPA deference applies," the Supreme Court has stated that courts may "deny writs of habeas corpus under § 2254 by engaging in *de novo* review because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review."  *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## V.     DISCUSSION

### A.     Claims Related to the Suppression Motion (Grounds Two, Four, and Six)

Grounds Two, Four, and Six of the petition relate to Petitioner's efforts to prove that a Fourth Amendment violation occurred in connection with the seizure and search of his cell phone.  In Ground Four, he asserts that his conviction was based on evidence—the text messages on his cell phone—obtained from an illegal search and seizure.  (Dkt. 1 at 15). In Grounds Two and Six, he challenges the trial court's failure to hold a suppression hearing on the motion to suppress the text messages.  (*Id.* at 15, 17).

Respondent contends that all three grounds for relief are barred because Petitioner had a full and fair opportunity to litigate them in state court.  (Dkt. 16 at 20-21 (citing *Stone v. Powell*, 428 U.S. 465 (1976)).   In *Stone*, the Supreme Court held that "where the State has provided *an opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 481-82 (emphasis supplied).  As a general matter, "[w]hen the state provides a facially adequate procedure, a petitioner cannot gain review of a Fourth Amendment claim simply by arguing that the federal court would have reached a different result."  *Shaw v. Scully*, 654 F. Supp. 859, 863 (S.D.N.Y. 1987) (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) (en banc)).

The Second Circuit has recognized only two possible exceptions to *Stone*'s bar— the state provided "no corrective procedures at all" for review of alleged Fourth

Amendment violations, or the petitioner was "precluded from using" the corrective procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).  The Second Circuit explicitly has held that "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Id.* at 72.   An "unconscionable breakdown" will not be found absent some sort of "egregious" "disruption or obstruction of a state proceeding." *Id.* at 70.

By statute, New York State provides a corrective procedure for litigating Fourth Amendment claims, which courts in this Circuit have recognized as "facially adequate." *Id.* n.1 (collecting cases).  Petitioner availed himself of this corrective procedure by filing a suppression motion in the trial court and appealing the trial court's unfavorable decision to the Appellate Division, which concluded that the suppression motion was "properly denied." *Hackett*, 166 A.D.3d at 1484.

As an initial matter, the Appellate Division found that the motion to suppress the text messages was Petitioner's second suppression motion, in contravention of C.P.L. § 255.20(2)'s "single motion rule." *Id.* at 1483.  Moreover, it was untimely under C.P.L. § 255.20(1) as it was filed 45 days after arraignment. *Id.*  The Appellate Division further found that while a change in the applicable law may constitute "good cause" under C.P.L. § 255.20(3) to entertain a motion filed outside of the limits imposed by C.P.L. § 255.20(1) and (2), *Riley* was not "good cause" because it did not actually afford Petitioner the relief he sought. *Id.*

The Appellate Division explained that in *Riley*, the Supreme Court determined that "officers must generally secure a warrant before conducting [a search of data stored in a cell phone]." *Id.* at 1484 (alterations in original) (quoting *Riley*, 573 U.S. at 386).  The Appellate Division stated that "[a]lthough *Riley* prohibits warrantless searches of cell phones incident to a defendant's arrest, *Riley* does not prohibit officers from sending text messages to a defendant, making observations of a defendant's cell phone, or even manipulating the phone to some extent upon a defendant's arrest." *Id.* (citing *Riley*, 573 U.S. at 387, 390-91).  The Appellate Division concluded that contrary to Petitioner's contention, "nothing in [Deputy Erion's] warrant application support[ed] the inference that the police opened or manipulated the phone to get inside to retrieve data prior to obtaining the search warrant." *Id.*  Moreover, the Appellate Division observed that "*Riley* provides that the search incident to arrest exception to the warrant requirement entitles law enforcement officers to 'examine the physical aspects of a phone' after it has been seized." *Id.* (quoting *Riley*, 573 U.S. at 387).  The Appellate Division concluded that "[i]nasmuch as the information included in the warrant application [was] not suggestive of a warrantless search of the phone, . . . the Supreme Court's decision in *Riley* did not provide good cause for defendant's untimely second suppression motion." *Id.*

The Appellate Division further found that "even if [Deputy Erion]'s actions in sending a confirmatory text message to defendant's phone did constitute an unlawful search under *Riley*, . . . the validity of the warrant to search defendant's phone was not vitiated" because "[t]he police did not use the alleged illegal search 'to assure themselves that there [was] cause to obtain a warrant' in the first instance." *Id.* at 1484 (some internal

quotation marks omitted) (citing *People v Burdine*, 147 A.D.3d 1471, 1472 (4th Dep't 2017)).   Instead, "the remaining factual allegations in the warrant application provided probable cause to search the cell phone that was recovered from defendant at the time of his arrest."  *Id.*   After the Appellate Division rejected the Fourth Amendment claims, Petitioner's appellate counsel sought leave to argue them before the New York Court of Appeals (SR: 580-82), which was denied (SR: 595-96).

Petitioner has offered nothing more than his own opinion that the state courts wrongly decided his suppression arguments.   Therefore, he has not shown that an unconscionable breakdown occurred during the litigation of his Fourth Amendment claims using the corrective procedures offered by the New York State courts.   The fact that Petitioner has couched Grounds Two and Six as due process violations based on the trial court's refusal to hold a hearing does not remove them from *Stone*'s ambit.  *See Capellan*, 975 F.2d at 69, 71-72 (*Stone* barred habeas petitioner's contention that, under then-recent Supreme Court precedent, the state court was mandated to hold a hearing on his pre-trial suppression motion).  Grounds Two, Four, and Six accordingly are dismissed as barred by *Stone*.

### B.   *Brady* Claim (Ground Three)

Petitioner asserts that the prosecution violated *Brady* when it failed to disclose the second page of New York State Incident Report No. 2013-00004659.  (Dkt. 1 at 15). Petitioner asserts that the second page of the report is exculpatory because it states that "during the evening & late evening hours of Sun[day], April 14, 2013, and the early

morning hours of Mon[day], April 15, 2013[,] [the] complainant[, H.O.,] was with someone (not) petitioner during those exact time periods." (Dkt. 1 at 15).

The first page of the report, which was turned over to Petitioner prior to trial (SR: 431), indicates that it is a missing person's report lodged by H.F. with regard to H.O. (SR: 432). Officer Arick C. Perkins ("Officer Perkins") of the Batavia Police Department took the report at about 11:52 p.m. on April 15, 2013. (SR: 432). H.F. informed Officer Perkins that H.O. had been missing since about 8:00 p.m. on April 14, 2013. (*Id.*).

The "Narrative" section of the report begins at the bottom of the first page and reflects H.F.'s statements to Officer Perkins concerning how and when she realized H.O. was missing. (*Id.*). The report's second page is a continuation of the "Narrative" section. (Dkt. 28 at 2). Officer Perkins noted that H.F. told him she had spoken to H.O.'s DSS caseworker, Becca Nigro ("Nigro"), prior to making the missing person's report. (*Id.* at 2). Officer Perkins then contacted Nigro, who said she had received a call from H.O.'s foster mother, Kolleen Zaffran ("Zaffran"), on April 14, 2013, informing Nigro that she was unable to pick up H.O. after the scheduled visitation with H.F. (*Id.*). Nigro indicated to Officer Perkins that she contacted H.F. on April 15, 2013, and learned that H.O. was not with H.F. (*Id.*). Nigro also confirmed with H.O.'s school that she was absent. Nigro then "provided [to Officer Perkins] two names that [H.O.] might be with," as well as addresses for both individuals. (*Id.*). Officer Perkins "checked the residence" of the first person "but was unable to get an answer at the door." (*Id.*). The second individual was described as one of H.O.'s friends who had been in juvenile detention and "was supposed to be getting out this week." (*Id.*). Officer Perkins spoke to that individual's father, "who stated that

his son did get out today[, April 15, 2013,] at 11:00 AM but has been with him the entire day and has not seen or been in contact with [H.O.]."  (*Id.*).

Respondent maintains that the report's second page was not part of the record before the state court and cannot be considered under the Supreme Court's interpretation of 28 U.S.C. § 2254(d).  Respondent also argues that the Appellate Division adjudicated the claim on the merits.  However, if—as Respondent argues—the second page of the police report was not part of the record of Petitioner's criminal proceeding, the Appellate Division arguably could not have adjudicated the *Brady* claim on the merits.  "When a defendant attempts to raise a *Brady* claim on direct appeal concerning matters that are outside the record, the New York courts almost invariably reject the appeal, remitting the defendant to a [C.P.L.] § 440 motion, if one is available."  *Pearson v. Ercole*, No. CV-06-5315(BMC), 2007 WL 2128350, at *15 (E.D.N.Y. July 25, 2007) (collecting cases), *aff'd*, 310 F. App'x 445 (2d Cir. 2009).

Petitioner conceded that the second page of the report was not part of the record on appeal.  (SR: 480).  Nonetheless, Petitioner requested that the Appellate Division consider the second page as it was "clearly an item in all search warrant applications['] 'allegation[]s of fact' item/paragraph no: (2) as report '13-4659' taken by Arick-or-Arik C. Perkins. . . ."  (SR: 480 citing 22 N.Y.C.R.R. § 1000.4(a)[(1)](iii)).  Section 1000.4(a)(1)(iii), at the time, was part of the Appellate Division's rules of practice and provided that "in a criminal matter, the failure of the parties or their attorneys to list in the stipulation to the record on appeal any transcript, exhibit or other document that constituted a part of the underlying prosecution shall not preclude the court from considering such transcript, exhibit or other

document in determining the appeal." *People v. Davis*, 106 A.D.3d 1510, 1511 (4th Dep't 2013) (alterations omitted) (quoting 22 N.Y.C.R.R. § 1000.4(a)(1)(iii) (former)).[11]

Petitioner is correct that the search warrant applications stated that the entire report was "attached." (SR: 85, 91). As the search warrant applications certainly were part of Petitioner's "underlying prosecution," he appears to have a colorable argument that the Appellate Division appropriately could have considered the report's second page. *See, e.g.*, *People v. Parnell*, 221 A.D.3d 1554, 1555 (4th Dep't 2023) (finding that the defendant's "purported failure to submit adequate record did not require dismissal or summary affirmance of his appeal of his convictions" where "all documents deemed by appellate court to be appropriate for appeal were requested and considered" (citing 22 N.Y.C.R.R. §§ 1000.7(c), 1250.7(d)).

Even assuming that the report's second page was properly before the Appellate Division, there is a question as to whether Petitioner presented a standalone *Brady* claim on appeal. While the Appellate Division stated that it had "considered the remaining contentions in defendant's *pro se* supplemental brief and conclude[d] that they are without merit," *Hackett*, 163 A.D.3d at 1486-87, it is not clear that Petitioner's *pro se* supplemental appellate brief raised a standalone *Brady* claim based on the failure to disclose the report's second page. Instead, he appears to have raised it only as a predicate for his claim under "Point I" that trial counsel was ineffective. (SR: 427, 457-64). More specifically, Petitioner argued that his "defense attorney's failure to timely file Omnibus Motion

---

[11] In the most current version of the rules, § 1000.4(a)(1)(iii) has been renumbered as § 1000.7(c). *See* 22 N.Y.C.R.R. § 1000.7(c) (eff. Sept. 17, 2018).

preclude[d] [him] from dozen[]s of item[]s of 'Discovery Material & Inspection'; 'Suppression of Evidence, Warrants & Tangible Property'; from receiving a true and correct 'Bill of Particular[]s'; '*Brady* Material' and from receiving a fair trial." (SR: 427). Courts have concluded that "raising a constitutional claim as a predicate for a claim of ineffective assistance of counsel exhausts only the ineffectiveness claim, not the underlying constitutional claim." *Navarro v. McCarthy*, No. 6:20-CV-06094 EAW, 2023 WL 8375858, at *19 (W.D.N.Y. Dec. 4, 2023) (citing *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001) (finding that petitioner did not exhaust standalone claims of prosecutorial misconduct by raising them in a *coram nobis* motion as predicates for the claim of ineffectiveness of appellate counsel, on the theory that effective counsel would have appealed on those grounds, because the claims were "distinct . . . in procedural terms under state law and in their federal constitutional sources")).

"[I]n habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit." *Quinney v. Conway*, 784 F. Supp. 2d 247, 260 (W.D.N.Y. 2011) (alteration in original) (quoting *Boddie v. New York State Div. of Parole*, 288 F. Supp. 2d 431, 439 (S.D.N.Y. 2003); citing *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas petition is justified in rare situations, "for example, if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law")); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the

applicant to exhaust the remedies available in the courts of the State."). Because Petitioner's *Brady* argument is plainly meritless, judicial efficiency favors proceeding directly to the claim's merits. The Court assumes, solely for purposes of resolving the petition, that the report's second page is part of the state court record as contemplated by § 2254(d).

*Brady* held that the suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[N]ot all instances of governmental nondisclosure violate *Brady*, or warrant such relief." *United States v. Hunter*, 32 F.4th 22, 30-31 (2d Cir. 2022). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice in the *Brady* context means "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Supreme Court has "noted that there is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) (quoting *Moore v. Illinois*, 408 U.S. 786, 795 (1972)), *holding modified on other grounds by Bagley*, 473 U.S. at 681-83; *see also United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("The government has no *Brady* obligation to '"communicate preliminary,

- 30 -

challenged, or speculative information.'"" (quoting *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990) (quoting *Agurs*, 427 U.S. at 109 n.16 (citations omitted in original))). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.*; *see also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (reversing grant of habeas relief on *Brady* claim where lower court reasoned that undisclosed results of a witness's polygraph test were "material" because they "might have led [the defendant]'s counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized"; Supreme Court characterized lower court's judgment as "based on mere speculation, in violation of the standards we have established" in *Brady* and its progeny).

As set forth above, the report's second page (Dkt. 28 at 2) says nothing definitive concerning H.O.'s whereabouts after she left H.F.'s apartment on the evening of April 14, 2013.  At best, it contained speculation by H.O.'s DSS caseworker on the day after the rape as to two individuals whom H.O. "might be with."  As Officer Perkins documented, H.O. was not found at either location.  Thus, the report does not establish that H.O. was with someone other than Petitioner during the evening and late evening hours of Sunday, April 14, 2013, and the early morning hours of Monday, April 15, 2013.  H.O. was not found with either of the identified individuals, and in fact, H.O. could not possibly have been with the second individual because he was in juvenile detention until the late morning of April 15, 2013.

The information in the report's second page is neither exculpatory nor is there a reasonable probability that its disclosure would have somehow resulted in a different result at trial. In other words, the information would not have assisted Petitioner in proving that H.O. was not with him at the time the rape allegedly happened. Because the report's second page did not contain any information that was favorable to Petitioner's case, much less material to his defense, Petitioner has not established that it triggered the prosecution's disclosure obligations under *Brady*. *See*, *e.g.*, *Amiel*, 95 F.3d at (finding that government "had no obligation [under *Brady*] to inform the defense" about allegations that a government witness was "deeply involved in organized crime and had committed several murders" because, after law enforcement investigated the witness's alleged wrongdoing, it confirmed that he was not a suspect, was not arrested, and the accusation against him was not credible). Petitioner has not demonstrated the three elements of a true *Brady* violation, and Ground Three therefore does not warrant habeas relief.

### C.    Trial Court's Denial of the Discovery Motion (Ground Five)

Petitioner asserts that the trial court erroneously denied defense counsel's motion for discovery. (Dkt. 1 at 16). To the extent Petitioner contends that the trial court erroneously rejected the motion as untimely and incorrectly agreed that the prosecution already had provided the requested discovery, he asserts nothing more than an alleged misapplication of New York State's discovery statute. It is well settled that errors of state law do not present a cognizable basis for habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. . . ."); 28 U.S.C. § 2254(a).

Petitioner also contends that the trial court wrongly accepted the prosecution's representation that no *Brady* material existed among the discovery items sought by the defense.  However, as discussed above, the second page of the report did not fall within *Brady*'s scope; it contained no information that was favorable and material to Petitioner's defense.  Therefore, the trial court's refusal to compel the prosecution to turn over the report's second page did not result in a violation of Petitioner's due process rights as protected by *Brady*.  Ground Five accordingly does not entitle Petitioner to habeas relief.

## D.  Ineffective Assistance of Counsel (Grounds One and Seven)

In Ground One, Petitioner asserts that defense counsel erroneously conceded in his moving papers and at oral argument that his discovery demand was filed late.  (Dkt. 1 at 14).  The Appellate Division rejected this claim on direct appeal, holding that "defense counsel demanded discovery within the 30-day deadline set forth in [former] CPL 240.80(1), and . . . the People subsequently provided the requested discovery to defendant." *Hackett*, 166 A.D.3d at 1485.  In Ground Seven, Petitioner asserts that the Appellate Division mischaracterized the record by finding that the prosecution provided the discovery items defense counsel had requested.  (Dkt. 1 at 15).

Because Petitioner's ineffectiveness claim was adjudicated on the merits, 28 U.S.C. § 2254(d)(1) requires him to show that the Appellate Division unreasonably applied or ruled in a manner contrary to the clearly established Supreme Court precedent for evaluating ineffectiveness claims, *Strickland v. Washington*, 466 U.S. 668 (1984).  To satisfy *Strickland*'s two-part test, Petitioner must establish that his "attorney's representation amounted to incompetence under 'prevailing professional norms,' not

- 33 -

whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). Petitioner also must show that counsel's performance resulted in prejudice to the defense, defined as "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." 466 U.S at 696. To the extent Petitioner challenges the Appellate Division's factual findings, he must show that the Appellate Division's decision resulted in an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2); and/or rebut the presumption of correctness accorded to the Appellate Division's findings of fact by clear and convincing evidence, *id.* § 2254(e)(1).[12]

As Petitioner correctly notes, the prosecution never turned over the report's second page, which was specifically requested by defense counsel in his discovery motion. Notwithstanding this factual inaccuracy, Petitioner has not stated a successful *Strickland* claim.

Petitioner cannot demonstrate that defense counsel performed deficiently because, as the Appellate Division correctly determined, the discovery motion was timely. Petitioner does not quarrel with this aspect of the Appellate Division's ruling. Petitioner also cannot show that he was prejudiced by defense counsel's mistaken concession that the motion was untimely. There is no suggestion that the prosecution relied on defense counsel's concession in declining to disclose the report's second page. Even assuming that

---

[12] "The Supreme Court has yet to explain how these two provisions[, § 2254(e)(1) and (d)(2),] interact." *Cardoza v. Rock*, 731 F.3d 169, 178 n.5 (2d Cir. 2013).

it did, the report's second page was not exculpatory and would not have made any difference to Petitioner's defense.

Because Petitioner has not shown that defense counsel made an error that had any conceivable effect on the outcome of Petitioner's trial, the Appellate Division did not rule in a manner contrary to or unreasonably apply *Strickland* in rejecting the assertion the ineffectiveness claim. Grounds One and Seven accordingly do not warrant habeas relief.

### VI. <u>CONCLUSION</u>

For the reasons discussed above, the request for a writ of habeas corpus is denied, and the petition (Dkt. 1) is dismissed. The Court declines to issue a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(1), (2). The Clerk of Court is directed to terminate Gerard Jones, Superintendent, as a party; amend the caption[13] to add Darryl C. Towns, Board of Parole Chairman, as Respondent; enter judgment in favor of Respondent; and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      January 18, 2024
            Rochester, New York

---

[13] Given Petitioner's *pro se* status and the absence of any prejudice to Respondent, the Court *sua sponte* amends the petition to reflect the state official who presently has custody of Petitioner. The current Board of Parole Chairman is Darryl C. Towns. *See* https://doccs.ny.gov/board-parole (last accessed Jan. 9, 2024).